OPINION OF THE COURT
Marcy L. Kahn, J.
Defendant Peter Grupe is charged with assault in the third degree (Penal Law § 120.00), aggravated harassment in the second degree (Penal Law § 240.30 [3]), harassment (Penal Law § 240.25), and prohibited smoking on Long Island Rail *7 road (Public Health Law § 1399-p). Defendant has moved pursuant to CPL 170.30 (1) (a) and 170.35 (1) (c) to dismiss the count of aggravated harassment in the second degree as violative of his rights under the First and Fourteenth Amendments of the US Constitution.[1]
Defendant is charged with violating Penal Law § 240.30 (3), which provides as follows:
"A person is guilty of aggravated harassment in the second degree when, with intent to harass, annoy, threaten or alarm another person, he * * *
"3. Strikes, shoves, kicks, or otherwise subjects another person to physical contact, or attempts or threatens to do the same because of the race[,j color, religion or national origin of such person.”
With reference to this charge, the superseding information alleges: "Deponent observed defendant strike deponent about the face with his fist and body causing deponent substantial pain in the chest and numbness to the face while defendant shouted ethnic slurs directed toward deponent including 'Is that the best you can do? I’ll show you Jew bastard.’ ”
Defendant argues that this count should be dismissed because on its face and as applied to him the statute violates his freedom of speech and equal protection rights under the First and Fourteenth Amendments of the US Constitution.[2] Specifically, defendant complains that he is being prosecuted for allegedly making an antisemitic statement. He also argues that the potential punishment under Penal Law § 240.30 (3) of one year in jail is irrational and discriminatory, in that similar conduct involving slurs against the victim’s family, as opposed to his religion, would result in a charge of simple harassment (Penal Law § 240.25) carrying a maximum penalty of 15 days’ incarceration. (See, Hechtman, Practice Commentaries, McKinney’s Cons Laws of NY, Book 39, Penal Law § 240.30 [3]; § 240.31, 1988 Pocket Part, at 65.)
I. FIRST AMENDMENT ISSUES
(A)
Where the constitutionality of a State statute is called into *8 question, the court must first ascertain whether a construction of the enactment is fairly possible by which the question may be avoided. (Frisby v Schultz, 487 US —, 101 L Ed 2d 420 [June 27, 1988]; Erznoznik v City of Jacksonville, 422 US 205, 216 [1975]; People v Epton, 19 NY2d 496, 505 [1967], cert denied 390 US 29 [1968]; McKinney’s Cons Laws of NY, Book 1, Statutes § 150 [c].) Every presumption is in favor of the validity of a statute, and there is a very strong presumption that the. Legislature investigated and determined there to be a demonstrated need for the legislation in question. (Matter of Quinton A., 49 NY2d 328, 336 [1980].) This court should strike down a statute as unconstitutional only as a last resort and only when its unconstitutionality is shown beyond a reasonable doubt. (Defiance Milk Prods. Co. v Du Mond, 309 NY 537, 540-541 [1956].)
In this case it is possible to construe the statute in such a way that the First Amendment issue need not be reached. Section 240.30 (3) of the Penal Law, both on its face and as applied in this case, regulates violent conduct, and physical intimidation, when committed intentionally and because of racial, religious or ethnic prejudice. The legislative history of this section and of related Penal Law amendments which were added at the same time indicates that the Legislature was responding to an increase in reported incidents of physical harassment of people and vandalism of property motivated by bias and sought to increase penal sanctions imposed for this type of conduct.
In his memorandum in support of the measure, the Senate sponsor of the bill stated: "There has been an increase in the number of incidents where people are being exposed to racial or religious prejudice. Although many of these incidents occur at places of religious worship, numerous other cases have occurred at educational or residential buildings. No person should be subjected to the harassment or fear caused by racial or religious prejudice.” (NY State Senate, mem of Senator Levy in support of S 7579-C, Bill Jacket, L 1982, ch 191.) In transmitting the bill to the Governor for signature, Senator Levy characterized it as "expanding] the definition of aggravated harassment to include the striking or shoving of another person with the intent to harass based upon the victim’s race, color, religion or national origin.” (Letter from Senator Levy to Daniel, Counsel to the Governor, June 30, 1983.)
The clear intent of the measure, and the scope of the law as enacted, is to prohibit violence and physical intimidation *9 based upon bigotry. One could violate this statute while remaining entirely mute. The statement allegedly made by defendant in this case, "I’ll show you Jew bastard”, is not the. subject of the statutory prohibition, but rather is circumstantial evidence that his conduct was motivated by (defendant’s perception of) the complainant’s religion and thus comes within the ambit of the section.
The statute does not attempt to prohibit bigotry itself. The individual’s freedom to think, and indeed, speak, publish or broadcast views on the subjects of race, religion or ethnicity are not regulated by this law. Violent conduct is what is being regulated. And it should hardly need stating that regulation of violent conduct is at the heart of the State’s legitimate exercise of its police powers. A statute creating a crime is a valid exercise of the police power so long as there is a reasonable relationship between the public welfare and the prohibition of the particular conduct involved. (People v Judiz, 38 NY2d 529 [1976]; People v Dinan, 118 Misc 2d 857, 858 [Long Beach City Ct 1985] [upholding constitutionality of Penal Law § 240.30 (3)].) The public’s welfare is certainly enhanced by the existence of this statute.
I therefore find that section 240.30 (3) regulates violent conduct, or the threat of immediate violent conduct, and thus raises no issue under the First Amendment, either on the face of the statute or in this particular case. (See, Cohen v California, 403 US 15, 21 [1971]; People v Hollman, 68 NY2d 202 [1986]; People v Smith, 89 Misc 2d 789, 790 [App Term 1977] [upholding constitutionality of aggravated harassment statute (Penal Law § 240.30 [2])].)
(B)
Even were I to find defendant’s behavior expressive, however, that does not necessarily entitle it to First Amendment protection.
The Supreme Court has recently renewed its warning that " 'where demonstrations turn violent, they lose their protected quality as expression under the First Amendment.’ ” (Boos v Barry, 485 US 312, —, 99 L Ed 2d 333, 351 [Mar. 22, 1988], quoting Grayned v City of Rockford, 408 US 104, 116 [1972].)
Moreover, it has long been recognized that constitutional guarantees of freedom of speech do not prevent States from punishing certain " 'narrowly limited classes of speech’ ”, *10 including " 'fighting’ words — 'those which by their very utterance inflict injury or tend to incite an immediate breach of the peace.’ ” (Gooding v Wilson, 405 US 518, 522 [1972]; Chaplinsky v New Hampshire, 315 US 568, 571-572 [1942].)
Under most circumstances, and certainly under those here presented, a racial or ethnic insult shouted while striking, shoving or kicking the person who is the object of the insult will naturally tend to provoke violent resentment. Because section 240.30 (3) does nothing more than prohibit expression which, at best, must be seen as constituting "fighting words,” defendant’s First Amendment challenge must fail. (Accord, People v Smith, supra; People v Dinan, supra.)
(O
Giving defendant’s arguments the greatest imaginable latitude, one might conceivably argue that his actions contained a sufficient communicative element to bring the protection of the First Amendment into play.
Where speech and conduct are joined in a single course of action, First Amendment values must be balanced against competing societal interests. (City of Los Angeles v Preferred Communications, 476 US 488 [1986]; United States v O’Brien, 391 US 367, 376-377 [1968].) In such cases, governmental regulation, or even prohibition, of First Amendment activity is sufficiently justified (1) if it is within the constitutional power of the government; (2) if it furthers an important or substantial governmental interest; (3) if the governmental interest is unrelated to the suppression of free expression; and (4) if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to furtherance of that interest. (Wayte v United States, 470 US 598 [1985]; United States v O’Brien, supra; People v Hollman, supra.)
(1) As noted above, the constitutional and statutory power of the State to criminalize violent behavior cannot be questioned. The power and duty of the Legislature to revise the Penal Law to penalize certain conduct based upon a new class of crime which it finds occurring in the State is well established. (See, People v Judiz, supra.)
(2) The governmental interest furthered by the statute is both substantial and compelling. In addition to the legislative history mentioned earlier, this court takes judicial notice of certain facts which demonstrate that this State, through its *11 executive and legislative officers, continues at the present time to recognize a compelling governmental interest in penalizing bias-related violence.
Pursuant to executive order, the Governor of the State of New York in 1987 established a Task Force on Bias-Related Violence. (Executive Order No. 90, Feb. 6, 1987, reprinted at 9 NYCRR 4.90.) In that order, the Governor noted that "[s]everal events in our State and in other regions give us reason to give special attention to the link between prejudice and violence”, and he directed the Task Force to conduct hearings and investigate the incidence and nature of any bias-related violence occurring in the State and to report and make recommendations accordingly.
On March 15, 1988 the Task Force issued its final report to the Governor. Among its findings were that bias-related violence has a long history in the State and that the problem may be increasing with respect to certain regions, group members, and types of crime (LE 3);[3] that the current law enforcement response to bias-related violence in New York State is inadequate (LE 1); that existing laws, apparently including Penal Law § 240.30 (3), fail to include and protect victims of all types of bias-related violence (BL l);[4] that violence against some groups is systematically underreported by the media (M 4);[5] and that harassment and threats of violence designed to deprive minorities of equal access to housing has intensified (H 1).
The Task Force recommended the enactment of stiffer penalties for crimes motivated by prejudice against the victim (BL 1) and concluded that an increase in the grade of offense was necessary to deter bias crimes (DA 11).
Furthermore, the New York City Police Department has reported a near doubling, to 463, of bias-related crimes between 1986 and 1987, and is reportedly predicting 627 such incidents by the end of 1988. (NYLJ, Aug. 10, 1988, at 1, col 1, at 2, col 3.)
I also take judicial notice of the fact that seven different bills designed to increase penalties and augment remedies for bias-related violence were introduced during the Legislature’s current term, including A.6927, the Bias-Related Violence and *12 Intimidation Act of 1988, which was passed by the Assembly on June 23, 1988.
Finally, the Governor and the State Attorney-General have recently announced the promulgation of an executive order which would give the Attorney-General’s office new subpoena powers to help local District Attorneys in the prosecution of bias-related crimes. (NYU, Aug. 10, 1988, at 1, col 1.)
(3) The State’s interest in punishing bias-related violence is unrelated to the suppression of free expression. Penal Law § 240.30 (3) does not inhibit speech or other forms of expression unrelated to violence, nor does it affect one’s freedom of association.
(4) If the statute can be said to incidentally inhibit speech in some cases, those cases are likely to be very similar to the one now presented and would involve the incidental regulation of speech which accompanies violence arising from prejudice. The statute is narrowly drawn to hit only those situations involving acts of violence or physical intimidation, and those are the situations which must be reached for the statute to fulfill its articulated purpose.
Thus, even were this case to come within the parameters of the "speech-nonspeech” cases, the standards set forth by the Supreme Court in O’Brien (supra) are here satisfied. Defendant’s motion to dismiss on First Amendment grounds is denied.
II. EQUAL PROTECTION ISSUES
Defendant has challenged Penal Law § 240.30 (3) as violating his equal protection rights under the Fourteenth Amendment due to the Legislature’s determination to classify this crime as a class A misdemeanor, punishable by up to one year in jail. Similar conduct involving harassment not based upon the race or ethnicity of the victim is a noncriminal offense punishable by no more than 15 days in jail.
Defendant’s argument is no more compelling than the one advanced in Matter of Quinton A. (49 NY2d 328 [1980], supra), where a juvenile complained of discriminatory treatment under a law which mandated restrictive placement for any juvenile who committed a designated felony act involving infliction of serious physical injury on a person 62 years of age or more. Similar conduct committed against a younger victim would have permitted the youth an opportunity to try to *13 persuade the court at a dispositional hearing that a remedy other than restrictive placement would be appropriate.
In Quinton A. (supra) the Court of Appeals upheld the challenged provision of the Family Court Act, noting that the disparate treatment of the two classes of offenders had a rational basis, owing to the special vulnerability of elderly crime victims. (49 NY2d, supra, at 336-337.) The court found that the Legislature could have determined that the perpetrators of such crimes require different treatment, and the means chosen to effect that result was a reasonable policy choice which would not be disturbed by the court on review. (Supra.) The court rejected the notion that strict scrutiny had to be employed in evaluating the statute, since only the extent and duration of the appellant’s deprivation of liberty were at issue. (Supra.)
In this case, for similar reasons, the Legislature’s determination to classify bias-motivated harassment as a different grade of offense carrying a different grade of punishment is a rational exercise of that body’s functions. The Legislature was aware of increasing problems of bias-related violence and, given the emotional as well as physical scars left by such acts, reasonably determined to impose greater punishment for them.
Furthermore, there is a rational basis for the Legislature to have concluded that the measure was necessary to redress past discrimination against racial and ethnic minorities which had engendered violence and physical intimidation of individual members of such groups. (Cf., Sheet Metal Workers v EEOC, 478 US 421 [1986] [upholding a court-ordered affirmative action plan benefiting persons not themselves victims of union’s past discrimination]; Fullilove v Klutznick, 448 US 448 [1980] [upholding affirmative action plan against equal protection challenge, using rational basis approach, to give minority business enterprises enhanced access to contracting opportunities]; see, Tribe, American Constitutional Law, at 1522, n 7 [2d ed 1988].)
For these reasons, defendant’s motion to dismiss on equal protection grounds must be denied.
For the foregoing reasons, the motions to dismiss are denied in all respects. The case is referred to the calendar Judge for determination of a trial date.

. Other grounds for relief raised by defendant have been addressed in the decision and order filed previously in this case.

. Defendant has not challenged the statute under any provision of the New York State Constitution. (Cf., People ex rel. Arcara v Cloud Books, 65 NY2d 324 [1985], revd 478 US 697 [1986], on remand 68 NY2d 553 [1986].)

. References are those used in the report.

. The Task Force particularly noted that gay men and lesbians are not protected by the existing statutes.

. These groups include Asians, Hispanics, and gays/lesbians.