(939 P.2d 942)

No. 75,213

CITY OF WICHITA, KANSAS, A MUNICIPAL CORPORATION,
*Appellee*, v. JOHN A. EDWARDS, *Appellant*.

Opinion filed May 23, 1997.

*Gerald J. Domitrovic*, of Wichita, for appellant.

*Sharon L. Dickgrafe*, assistant city attorney, and *Kelly Rundell*, assistant city attorney, for appellee.

Before BRAZIL, C.J., MARQUARDT, J., and EDWARD E. BOUKER, District Judge, assigned.

BRAZIL, C.J.: In this direct criminal appeal, the defendant John Edwards challenges the constitutionality of the Wichita City Code

ethnic intimidation or bias crimes ordinance. Edwards contends the ordinance is unconstitutionally overbroad and vague, and also violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Edwards further argues that his conviction under the ordinance is multiplicitous with his convictions for battery and disorderly conduct. We affirm in part and reverse in part.

Edwards and his girlfriend, Terri Smith, were at a club when Smith and her ex-roommate, Marie Anderson, met and had a conversation. Anderson asked for and received her house key from Smith. Anderson is black. Edwards, who is white, was wearing a T-shirt with the slogan "white power" on the front. According to Edwards, Anderson upset Smith by calling her a "Nazi-loving slut" and threatening to expose her cocaine habit.

According to Anderson, Edwards shoved her chair, pinning her up against the bar, and said, "You goddamn nigger bitch, if you ever talk to Terri again, I'll fucking kill your ass." Edwards then spat in her face. Anderson described Edwards as very hostile, hateful, and angry. Edwards released her and left the club.

Although Edwards did not recall touching Anderson's chair, he admitted yelling at Anderson and calling her names. Edwards stated that he told Anderson he would "cut her fat nigger legs off" if she did not leave Smith alone. Edwards stated that he did not approach Anderson because she was black, but did so because he wanted to tell her to leave Smith alone. Edwards denied spitting on Anderson. Edwards also acknowledged that he was a skinhead and has the word "skinhead" tattooed on the back of his head.

Edwards was charged under the Wichita City Code with battery, disorderly conduct, and ethnic intimidation. The municipal court found Edwards guilty of all three charges, and he appealed to the district court. Edwards moved to dismiss the ethnic intimidation charge on constitutional grounds, but the court rejected his arguments. The court expressly adopted the reasoning set forth in the trial brief filed by the City of Wichita (City). The court found that the ethnic intimidation ordinance was not unconstitutionally vague or overbroad and did not violate the Equal Protection Clause. The court also found the charges were not multiplicitous. After an ev-

identiary hearing, Edwards was convicted and sentenced on all three charges.

The ethnic intimidation ordinance, section 5.01.010 of the Wichita City Code, provides:

**"5.01.010 Ethnic intimidation or bias crimes.**

"(a) Any person who violates or attempts to violate any of the following ordinances of the Code of the City of Wichita, Kansas, and any amendments thereto, by reason of any motive or intent relating to, or any antipathy, animosity or hostility based upon, the race, color, gender, religion, national origin, age, sexual orientation, ancestry, disability, or handicap of another individual or group of individuals shall be guilty of a misdemeanor:

"1. Chapter 5.10, Assault and Battery;
"2. Chapter 5.24, Disorderly Conduct;
"3. Section 5.66.010, Criminal Damage to Property;
"4. Section 5.66.050, Criminal Trespass;
"5. Chapter 5.82, Interfering with Telephone Service;
"6. Chapter 5.88, Unlawful Use of Weapons."

Edwards argues that the ethnic intimidation ordinance is unconstitutionally overbroad. Whether the ordinance is constitutional presents a question of law over which this court's review is unlimited. See *State v. Bryan*, 259 Kan. 143, 145, 910 P.2d 212 (1996).

It is a fundamental principle of Kansas law that statutes are presumed constitutionally valid. See *Barnes v. Kansas Dept. of Revenue*, 238 Kan. 820, Syl. ¶ 1, 714 P.2d 975 (1986).

"This court adheres to the proposition that the constitutionality of a statute is presumed, that all doubts must be resolved in favor of its validity, and before a statute may be stricken down, it must clearly appear the statute violates the constitution. Moreover, it is the court's duty to uphold the statute under attack, if possible, rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. [Citation omitted.]" *State v. Huffman*, 228 Kan. 186, 189, 612 P.2d 630 (1980).

See *State ex rel. Schneider v. Kennedy*, 225 Kan. 13, 19-21, 587 P.2d 844 (1978).

"An overbroad statute makes conduct punishable which under some circumstances is constitutionally protected from criminal sanctions." *Huffman*, 228 Kan. at 189. To avoid overbreadth, criminal statutes governing speech must be drawn with "the required narrow specificity to prohibit only a limited class of speech not

protected by the First Amendment." *Huffman*, 228 Kan. at 190 (discussing *Gooding v. Wilson*, 405 U.S. 518, 31 L. Ed. 2d 408, 92 S. Ct. 1103 [1972]); see *State v. Stauffer Communications, Inc.*, 225 Kan. 540, 546, 592 P.2d 891 (1979). "[A] statute or ordinance which is facially overbroad is to be construed and restricted to embrace only conduct which is not constitutionally protected." *City of Prairie Village v. Hogan*, 253 Kan. 423, 427, 855 P.2d 949 (1993).

The ethnic intimidation charge alleged Edwards committed battery and disorderly conduct, and Edwards contends that the ordinance is unconstitutional when applied to the disorderly conduct charge. Disorderly conduct includes the use of "offensive, obscene, or abusive" language, and Edwards argues that the ethnic intimidation law impermissibly criminalizes protected First Amendment speech.

The First Amendment prohibits the States from punishing use of language except in certain narrowly limited classes of speech, *Huffman*, 228 Kan. at 190, including "fighting words," which are defined as "those by which their very utterance inflict injury or tend to incite an immediate breach of the peace." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 86 L. Ed. 1031, 62 S. Ct. 766 (1942).

In *Huffman*, the Kansas Supreme Court construed the disorderly conduct statute, K.S.A. 21-4101, to prohibit speech only within the limited category of fighting words. 228 Kan. at 192. The Wichita City Code provision prohibiting disorderly conduct, section 5.24.010, is identical to K.S.A. 21-4101 and thus must also be narrowly construed to apply only to fighting words, which are not protected by the First Amendment.

Edwards contends that even if the ethnic intimidation ordinance does not directly punish protected speech, it has a chilling effect on expression of ideas because those expressions could subsequently be used as evidence of an individual's motivation or animosity. The United States Supreme Court has expressly rejected this contention, finding that "the prospect of a citizen suppressing his bigoted beliefs for fear that evidence of such beliefs will be introduced against him at trial . . . is simply too speculative a hy-

pothesis to support [an] overbreadth claim." *Wisconsin v. Mitchell,* 508 U.S. 476, 489, 124 L. Ed. 2d 436, 113 S. Ct. 2194 (1993). Edwards points out that past expressions have been and will continue to be used as evidence of motivation or animosity. This fact, however, does not alter or diminish the *Mitchell* Court's conclusion.

Edwards next cites *R.A.V. v. St. Paul,* 505 U.S. 377, 120 L. Ed. 2d 305, 112 S. Ct. 2538 (1992), where the court considered a city ordinance which made it a misdemeanor to place on public or private property a " 'symbol, object, appellation, characterization or graffiti, including, but not limited to, a burning cross or Nazi swastika, which one knows or has reasonable grounds to know arouses anger, alarm, or resentment in others on the basis of race, color, creed, religion, or gender.' " 505 U.S. at 380. The court held that even construing the ordinance as limited to fighting words, the ordinance was unconstitutional because it impermissibly regulated speech based on its content. 505 U.S. at 381, 391-96. The ordinance regulated fighting words that contained messages of bias-motivated hatred, but did not encompass fighting words that contained other messages. The court held that although the government may in certain instances constitutionally regulate fighting words, it may not regulate based on hostility or favoritism towards the underlying message expressed. 505 U.S. at 381-86.

Edwards points out that the ethnic intimidation ordinance only targets a limited number of motivations and intents. He argues that application of the *R.A.V.* decision leads to the conclusion that the ethnic intimidation law is an unconstitutional content-based regulation of speech.

The United States Supreme Court rejected a similar argument in *Mitchell.* The Wisconsin hate crimes law took the form of a penalty enhancement statute which provided a longer maximum sentence for an offense whenever a perpetrator intentionally selected a victim because of the victim's " 'race, religion, color, disability, sexual orientation, national origin, or ancestry.' " 508 U.S. at 480. In upholding the statute against a First Amendment challenge, the Court distinguished the statute in *R.A.V.,* which attempted to criminalize certain types of speech, from the penalty

enhancement statute at bar, which increased punishment for criminal conduct that is motivated by bias. "Nothing in our decision last Term in *R.A.V.* compels a different result here. . . . [W]hereas the ordinance struck down in *R.A.V.* was explicitly directed at expression (*i.e.* 'speech' or 'messages'), [citation omitted], the statute in this case is aimed at conduct unprotected by the First Amendment." 508 U.S. at 487.

In the present case, the ethnic intimidation ordinance is more similar to the penalty enhancement law considered in *Mitchell* than the speech prohibition law addressed in *R.A.V.* The ethnic intimidation law is not aimed at regulating speech, but rather is intended to penalize conduct undertaken by reason of a specific motivation or intent. Applying the rationale of *Mitchell*, we conclude the ethnic intimidation law is not a content-based regulation of free speech.

Edwards contends the ethnic intimidation law is void for vagueness. This court's scope of review is unlimited. *Bryan*, 259 Kan. at 145.

In *Huffman*, the court explained the test for vagueness:

"The test to determine whether a criminal statute is unconstitutionally vague and indefinite is whether its language conveys a sufficiently definite warning as to the conduct proscribed when measured by common understanding and practice. A statute which either requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process." 228 Kan. at 192.

"At its heart the test for vagueness is a commonsense determination of fundamental fairness." *State v. Kirby*, 222 Kan. 1, 4, 563 P.2d 408 (1977).

In addition to determining whether the proscribed conduct is adequately defined, courts must determine " 'whether the ordinance adequately guards against arbitrary and discriminatory enforcement.' " *State v. Adams*, 254 Kan. 436, 439, 866 P.2d 1017 (1994) (quoting *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 [1983]).

Edwards argues that the ethnic intimidation ordinance is unconstitutionally vague because it does not convey a sufficiently definite

warning as to what conduct is prohibited. Edwards singles out the language *"any* motive or intent *relating to,* or *any* antipathy, animosity or hostility *based upon,* the race, color, gender" and argues that the ordinance fails to quantify the intent, motivation, or animosity required. Section 5.01.010(a). (Emphasis added.)

The ordinance provides that any person who commits or attempts to commit one of the specified crimes *"by reason of* any motive or intent relating to, or any antipathy, animosity or hostility based upon, the race, color, gender" is guilty of ethnic intimidation. Section 5.01.010(a). (Emphasis added.) The phrase "by reason of," which Edwards ignores, limits the proscribed motivation, intent, or animosity to that which provided the basis for the individual's criminal actions. Thus, when read in its entirety, the ordinance prohibits commission of the specified crimes by reason of certain motivations. A person of ordinary intelligence need not guess at the meaning of the ordinance.

In *In re M.S.,* 10 Cal. 4th 698, 717, 42 Cal. Rptr. 2d 355, 896 P.2d 1365 (1995), the statute required that the defendant acted "because of" the victim's protected characteristic. In holding the statute was not unconstitutionally vague, the court found that the term "because of" was a term of common usage which connoted a causal link. The court concluded that persons of ordinary intelligence could understand what the statute prohibited. 10 Cal. 4th at 717. The court also held that the statute did not require the prohibited motivation to be the predominant or exclusive cause of the offense; rather, a crime with multiple concurrent causes is still done "because of" bias if the prohibited bias was a substantial factor in the commission of the crime. 10 Cal. 4th at 716.

Here, the ordinance requirement of action taken "by reason of" a proscribed motivation is substantially similar to the "because of" language upheld in *In re M.S. Cf. State v. Mortimer,* 135 N.J. 517, 532, 641 A.2d 257 (1994) (holding unconstitutionally vague a portion of a statute enhancing a penalty if the offender acted "at least in part" with a proscribed motivation). In addition, numerous other decisions have rejected vagueness challenges similar to the one advanced by Edwards. See Annot., 22 A.L.R.5th 261, 280-87.

Edwards offers no authority to the contrary, and our research discloses none.

Next, Edwards argues that the ethnic intimidation ordinance is unconstitutionally vague because, even limiting disorderly conduct to fighting words, a reasonable person must necessarily guess at what expressions will violate the ordinance. In *Huffman*, the court held that a narrow construction of the disorderly conduct statute to apply only to fighting words removed any possible vagueness because "[p]ersons of common intelligence need not guess at the meaning of the words 'alarm, anger or disturb,' when used in conjunction with fighting words." 228 Kan. at 193. Edwards characterizes this holding as "pure legal fiction."

However, this court is bound to follow the law as established by the Kansas Supreme Court. See *Gruhin v. City of Overland Park*, 17 Kan. App. 2d 388, 391, 836 P.2d 1222 (1992). *Huffman* necessitates a finding that the Wichita disorderly conduct ordinance, when authoritatively construed to prohibit speech only within the limited category of fighting words, is not unconstitutionally vague.

Edwards also cites *City of Wichita v. Hughes*, 12 Kan. App. 2d 621, 752 P.2d 1086 (1988), in support of his vagueness argument. *Hughes* held the Wichita ordinance governing disturbing the peace, the predecessor to the current disorderly conduct ordinance, was unconstitutionally vague. The court declined to authoritatively construe the ordinance to limit its application to fighting words, reasoning that the ordinance was too doubtful and uncertain in its meaning. 12 Kan. App. 2d at 624-25. In view of the holding in *Huffman*, *Hughes* adds little to the analysis of the vagueness issue.

Next, Edwards contends that the ethnic intimidation ordinance violates equal protection by protecting certain groups of people and not others. The Equal Protection Clause provides that no State shall " 'deny to any person within its jurisdiction the equal protection of the laws.' " *Jurado v. Popejoy Constr. Co.*, 253 Kan. 116, 123, 853 P.2d 669 (1993). Edwards points out that the ordinance addresses a limited number of motivations, and he argues that individuals who are victims of the proscribed offenses by reason of

other motivations or animosities are denied the equal protection of the ethnic intimidation ordinance.

Determining whether a statute violates equal protection is a question of law, and this court's review is unlimited. *Peden v. Kansas Dept. of Revenue*, 261 Kan. 239, 250, 930 P.2d 1 (1996). The presumption of constitutionality again applies to the ethnic intimidation ordinance. See *Peden*, 261 Kan. at 250.

"Equal protection is implicated when a statute treats 'arguably indistinguishable' classes of people differently." *Peden*, 261 Kan. at 251 (citing *Smith v. Printup*, 254 Kan. 315, 321, 866 P.2d 985 [1993]). Here, the ethnic intimidation ordinance draws distinctions based on the motivation underlying the crime.

The first step in any equal protection analysis is the determination of what level of scrutiny should be employed in examining the governmental classification: strict scrutiny, heightened scrutiny, or rational basis tests. See *Jurado v. Popejoy Constr. Co.*, 253 Kan. 116, 123-24, 853 P.2d 669 (1993); *Provance v. Shawnee Mission U.S.D. No. 512*, 231 Kan. 636, 641-42, 648 P.2d 710 (1982). Edwards argues that strict scrutiny applies because the right to equal treatment under the criminal laws is a fundamental right. This statement is tantamount to asserting that the right to equal protection is a fundamental right which justifies strict scrutiny whenever the right is implicated. Such is not the case. See *Jurado*, 253 Kan. at 123-24. Moreover, the ethnic intimidation ordinance does not distinguish among individuals based on suspect classifications such as race or national origin. Rather, the ordinance distinguishes between types of crime, targeting those motivated by bias. "[U]nless a classification warrants some form of heightened review because it jeopardizes exercise of a fundamental right or categorizes on the basis of an inherently suspect characteristic, the Equal Protection Clause requires only that the classification rationally further a legitimate state interest." *Nordlinger v. Hahn*, 505 U.S. 1, 10, 120 L. Ed. 2d 1, 112 S. Ct. 2326 (1992). Thus, the lower level of scrutiny applies to the ethnic intimidation ordinance. See *Mortimer*, 135 N.J. at 536-37; Annot., 22 A.L.R.5th, 261, 287-91.

Under the rational basis test, a legislative classification " 'must bear a rational relationship to a legitimate objective.' " *Jurado*, 253

Kan. at 123 (quoting *Stephenson v. Sugar Creek Packing*, 250 Kan. 768, 774, 830 P.2d 41 [1992]). The constitutionality of the legislative classification is presumed, and the burden falls on the party challenging the statute to prove no rational basis exists. *Jurado*, 253 Kan. at 123.

Courts have recognized that the need for hate crime laws stems from the fact that bias-motivated crimes are more likely to provoke retaliatory crimes, inflict distinct emotional harm on their victims, and incite community unrest. See *Mitchell*, 508 U.S. at 484; *In re Joshua H.*, 13 Cal. App. 4th 1734, 1748 n.9, 17 Cal. Rptr. 2d 291 (1993). Therefore, the State has a legitimate interest in protecting its citizens from bias-related crimes. The ethnic intimidation ordinance is rationally related to this valid legislative objective through its punishment and deterrence of bias-motivated crimes. Accordingly, the ordinance does not violate equal protection. See *Mortimer*, 135 N.J. at 536-38; Annot., 22 A.L.R.5th 261, 287-91.

Edwards argues that the current racial climate demonstrates that the ethnic intimidation law will be enforced in an unequal manner against whites. Edwards states that "[r]acial discrimination against whites and hostility to whites by the government, media and even the judiciary are official policy." Edwards also contends that the intent behind the ethnic intimidation ordinance is to remedy past discrimination against minorities, which is essentially a new form of discrimination against whites.

Edwards provides no evidence to support his claims regarding the racial climate and unequal enforcement of the ethnic intimidation ordinance. The ordinance is racially neutral on its face; it protects any individual, regardless of race, from racial discrimination. Moreover, while some courts have cited a need to remedy past minority discrimination as part of the justification for bias crime laws, see *People v. Grupe*, 141 Misc. 2d 6, 13, 532 N.Y.S.2d 815 (1988), other courts have acknowledged the more serious nature of hate crimes as the reason for bias crime statutes. See *Mitchell*, 508 U.S. at 484-85; *In re Joshua H.*, 13 Cal. App. 4th at 1748 n.9; *State v. Beebe*, 67 Or. App. 738, 680 P.2d 11, *rev. denied* 297 Or. 459 (1984). Edwards' equal protection argument is not persuasive.

Edwards next contends that his convictions are multiplicitous. Whether multiplicity exists is a question of law over which this court's review is unlimited. See *State v. Perry*, 16 Kan. App. 2d 150, 151, 823 P.2d 804 (1991).

This court recently restated the law regarding multiplicity:

"Multiplicity in a criminal pleading is the charging of two or more counts where only a single criminal act is involved. . . . The principles for determining whether charges are multiplicitous are: (1) A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the State with the basis for more than one criminal prosecution. (2) If each offense charged requires proof of a fact not required in proving the other offense, the offenses do not merge. (3) Where offenses are committed separately, at different times and at different places, they cannot be said to arise out of a single wrongful act." *State v. Manzanares*, 19 Kan. App. 2d 214, 220, 866 P.2d 1083 (1994).

K.S.A. 21-3107 codifies the rule against multiplicity and provides that an individual may be convicted of either the charged crime or an included crime, but not both. An included crime may be, *inter alia*, "a crime necessarily proved if the crime charged were proved." K.S.A. 21-3107(2)(d). *State v. Fike*, 243 Kan. 365, 368, 757 P.2d 724 (1988), establishes a two-prong test for determining lesser included offenses under K.S.A. 21-3107(2)(d). In discussing the second prong of the test, the court stated:

"The result of the first step of the analysis, however, is not necessarily conclusive. Even if the statutory elements of the lesser offense are not all included in the statutory elements of the crime charged, a particular crime may nevertheless meet the statutory definition in K.S.A. 21-3107(2)(d) of an included crime under the second step of the analysis. This approach requires the trial court to carefully examine the allegations of the indictment, complaint, or information *as well as* the evidence which must be adduced at trial. If the factual allegations in the charging document allege a lesser crime which does not meet the statutory elements test *and* the evidence which must be adduced at trial for the purpose of proving the crime as charged would also necessarily prove the lesser crime, the latter is an 'included crime' under the definition in K.S.A. 21-3107(2)(d)." *Fike*, 243 Kan. at 368.

Courts utilize the second prong of the *Fike* test to determine whether offenses are multiplicitous. See *State v. Rinck*, 256 Kan. 848, 850-51, 888 P.2d 845 (1995); *State v. Warren*, 252 Kan. 169, 176-77, 843 P.2d 224 (1992); *Perry*, 16 Kan. App. 2d at 152-55. In

applying the second prong of *Fike*, "the test is not what the State *may* prove, but what the State is *required* to prove." *State v. Rush*, 255 Kan. 672, 677, 877 P.2d 386 (1994).

Under the facts of the instant case, to prove ethnic intimidation the City was required to prove Edwards acted with a racial motivation and violated the Wichita battery or disorderly conduct ordinances. The charging document did not allege an attempted crime; it alleged Edwards committed battery and disorderly conduct. Therefore, to prove ethnic intimidation the City was required to prove Edwards committed battery or disorderly conduct. Because the evidence adduced at trial for the purpose of proving ethnic intimidation as charged also necessarily proved battery and disorderly conduct, the latter are included offenses, and the convictions are multiplicitous. See K.S.A. 21-3107(2)(d); *Fike*, 243 Kan. at 368.

We reverse Edwards' convictions for battery and disorderly conduct.

Finally, Edwards attacks the sufficiency of the evidence supporting his conviction for ethnic intimidation.

"When the sufficiency of the evidence is challenged in a criminal case, the standard of review is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, [the appellate court is] convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. McIntyre*, 259 Kan. 488, 499, 912 P.2d 156 (1996).

In the present case, substantial evidence exists indicating Edwards' actions were racially motivated. Edwards used racial epithets during the encounter with Anderson, twice referring to her as a "nigger." Edwards admitted he was a "skinhead," as evidenced by the tattoo on the back of his head. Also, Edwards was wearing a "white power" T-shirt. However, other evidence exists to support a conclusion that Edwards did not act out of racial hatred. Edwards testified that Anderson had upset Smith and that his motivation in approaching Anderson was to tell her to leave Smith alone.

Under our deferential standard of review, it is clear that a rational factfinder could have found beyond a reasonable doubt that

Edwards' actions were motivated by racial animosity. Accordingly, Edwards' conviction for ethnic intimidation must be affirmed.

Affirmed in part and reversed in part.